# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JULIE GOLDBERG-BOTVIN**, *et al.*,      ) | |
| ) | |
| **Plaintiffs,**    ) | |
| ) | |
| **v.**    ) | **Civil No. 12-1292 (RCL)** |
| ) | |
| **THE ISLAMIC REPUBLIC OF IRAN,**    ) | |
| ) | |
| **Defendant.**    ) | |
| ) | |

## MEMORANDUM OPINION

This action against the Islamic Republic of Iran ("Iran") arises from an act of state-sponsored terrorism. The decedent, a fourteen-year-old United States citizen named Yael Botvin, was killed in a September 4, 1997, suicide bombing in the crowded pedestrian mall on Ben Yehuda Street in downtown Jerusalem, Israel, by Hamas. In a previous action under the former state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7), the Court awarded $1.7 million in compensatory damages to Yael's estate against Iran and other defendants but denied other forms of requested damages, including solatium damages for family member plaintiffs and punitive damages for all plaintiffs. *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 246 (D.D.C. 2012). Shortly after the verdict in that case, the plaintiffs filed this suit under the updated state-sponsored terrorism provision, 28 U.S.C. § 1605A, seeking the damages they had been denied under the old statute. The Court GRANTS plaintiffs' motion for default judgment, ECF No. 13, and awards solatium and punitive damages as described below.

## I.      BACKGROUND

### A. Factual Background[1]

"Defendant Iran is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984." *Botvin,* 873 F. Supp. 2d at 237 (internal quotations and citation omitted).

In *Botvin*, this Court drew on expert testimony given during an evidentiary hearing in another § 1605(a)(7) case brought by individuals who were injured in the same bombing, *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 261 (D.D.C. 2003) (Urbina, J.), to find the following facts regarding Iran's involvement in the September 4, 1997, bombing:

> [T]he bombing was planned by a six-person Hamas cell organized by Mahmoud Abu Hanoud—a senior commander in Hamas' military wing. . . . [who] received most of his explosives and military training in an Iranian-sponsored terrorist training camp.
>       . . . Iran was encouraging and pushing Hamas' leaders to carry out suicide bombings as a policy, and that policy was approved by the highest authorities in Iran.  Iran's relationship with Hamas began in the early 1990s.  In 1994, Iran received the first delegation of Hamas members who were trained directly by the Iranians on Iranian soil.  As the Iran–Hamas relationship matured, the involvement of Iran became stronger and stronger with Hamas and especially with these terrorist activities . . . .
>       Abu Hanoud personally directed the scouting, planning, disguising, safe housing, traveling, and purchasing involved in this sophisticated attack.  . . . Without Iran, Abu Hanoud would never have known how to build this type of bomb and conduct this type of operation.  Prior to the attack, Abu Hanoud

---

[1] Under the FSIA, a court must, out of respect for the principle of sovereign immunity, ensure that plaintiffs "establish [their] claim or right to relief by evidence that is satisfactory to the court."  28 U.S.C. § 1608(e). To satisfy this burden, plaintiffs in this action ask this Court to take judicial notice of prior findings of fact and evidence related to the Ben Yehuda street bombing and Iran's involvement in the attack.  *See* Pls.' Mot. 4–6.  Earlier judicial findings of fact "represent merely a court's probabilistic determination as to what happened" and thus constitute hearsay and are ordinarily inadmissible.  *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010).  However, the FSIA "permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced." *Id.*; *see also Taylor*, 811 F. Supp. 2d at 6–7.

assigned a Hamas member named Al Zaban—who disguised himself as a surveyor—to scout areas of Jerusalem to find the most crowded, the most effective places for . . . an attack.  Al Zaban settled on the pedestrian mall because of its crowds of people and its proximity to government buildings. . . .

On the afternoon of September 4, 1997, three Hamas suicide bombers with cases of powerful explosive bombs arrived at the crowded Ben Yehuda Street pedestrian mall in downtown Jerusalem.  These bombs contained nails, screws, pieces of glass, and chemical poisons to cause maximum pain, suffering, and death.  The bombs were intended to be detonated in intervals designed to inflict maximum causalities on both civilians and responding rescue workers.  The explosion wounded nearly 200 civilians and killed five, including fourteen-year-old Yael Botvin, the daughter of plaintiff Julie Goldberg–Botvin and sister of plaintiffs Tamar and Michal Botvin.  Hamas publically claimed responsibility for the bombing.

*Botvin*, 873 F. Supp. 2d at 237–38 (internal quotations, modifications, and citations omitted).

This Court in *Botvin* found the following facts regarding the four plaintiffs, citing deposition testimony of Yael's mother, Julie Goldberg-Botvin, and sister Michal, an affidavit from her sister Tamar, and other evidence:

Yael Botvin, a fourteen-year-old ninth grader, was on her way home from the Emunah School for the Arts in Jerusalem, Israel, when she was killed by the September 4, 1997 suicide bombing.  Yael had stopped by the mall to buy school supplies when the bombing occurred. . . . Yael survived approximately four hours after the bombing, and died due to burns, puncture wounds, and other unspecified internal injuries caused by the explosion.  She was an American citizen at the time of her death. . . .

Julie Goldberg–Botvin, Yael's mother, spent "about two hours" not knowing whether Yael was safe or whether Yael had been injured by the bombing. She stated that "[i]t was horrible, but we didn't know what to do with ourselves so we just stayed there." . . . Julie . . . [was] then driven by friends to Bikur Cholim hospital where they were shown a picture of Yael's face and asked to identify her. [Julie testified that t]he first week "was very difficult because we have people coming to the house from the early morning until night."  Life without Yael was "very quiet . . . we still miss her." . . . Julie reflected that "[w]e might look okay on the outside, but on the inside we are not okay, even ten years later.  For me it's terrible to see Yael's friends who are now 24, 25 years old, and married and some of them have babies. It is very difficult." . . . Julie was a citizen of the United States at the time of Yael's death and remains so today.

Tamar Botvin . . . , an American citizen at the time of the bombing and today, was Yael's older sister. . . .  She was fifteen at the time of Yael's death. Since Yael's death, Tamar has "found it very difficult to discuss the emotional impact . . . and the best way for [her] to express [her] feelings is in writing."  On

the day of the bombing, Tamar was returning from a school trip when a teacher told her news Tamar described as the "worst of my life." Her sister's death came "less than four years after [their] father died of coronary artery disease." Tamar stated that "[w]e were just beginning to feel like we were coming to terms with the sudden loss of a parent when our family was torn apart again."

Michal Botvin, Yael's younger sister, was an American citizen at the time of the bombing and remains so today. . . . She was in seventh grade on September 4, 1997 and was eleven-years old. When the bombing occurred, Michal was home with her mother Julie; she later went with Julie to the hospital where she learned of Yael's death. Michael felt that "it was very hard for my mother and me and Tamar to deal with Yael's death, especially because my father died a few years before . . . it is still hard . . . to continue living with the loss of Yael." Even after ten years had passed, Michal explained that "it is hard to live knowing that Yael is not with us, and that she could have been with us."

*Botvin*, 873 F. Supp. 2d at 239 (internal citations omitted).

### B. Procedural Background

In *Botvin*, this Court entered default judgment against defendants Iran, the Iranian Ministry of Information and Security, and the Iranian Revolutionary Guard. *Botvin*, 873 F. Supp. 2d at 240–43. On July 3, 2012, the Court awarded $1.7 million in compensatory damages to Yael's estate, but denied her family members' claims for solatium damages. *Id.* The Court denied these claims because, under the "pass-through" regime of the former state-sponsored terrorism exception, they were based on Israeli law, which did not provide for this form of recovery to persons in the family-member-plaintiffs' positions. *Id.* at 244–45. The Court also denied punitive damages, which plaintiffs had conceded were unavailable. *Id.* at 245–46.

Plaintiffs filed the present action on August 3, 2012, pursuant to the updated state-sponsored terrorism provision, § 1605A, and named only Iran. *See* Compl., ECF No. 1. Yael's mother, Julie Goldberg Botvin, and her sisters, Tamar Botvin Dagan and Michal Botvin, seek solatium damages. The plaintiffs also seek punitive damages. Service was effected on Iran on November 7, 2012, via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). *See* Return of

Service/Affidavit, ECF No. 10.  The Clerk entered default, Jan. 22, 2013, ECF No. 12, and plaintiffs moved for default judgment, ECF No. 13.

## II.    ANALYSIS

### A.  Jurisdiction and Sovereign Immunity

The FSIA provides immunity to foreign states from suit and denies U.S. courts jurisdiction over such actions.  28 U.S.C. § 1604.  Under certain conditions, however, courts obtain original jurisdiction over suits against foreign states, and those states' immunities are waived by statute.

### 1.  Original Jurisdiction

The state-sponsored terrorism exception provides that federal courts possess original jurisdiction over suits against a foreign state only if (1) "money damages are sought" (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act . . . ."  28 U.S.C. § 1605A(a)(1); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 51 (D.D.C. 2012).

Here, each of these prerequisites is met.  First, plaintiffs' complaint only seeks "money damages."  *See* Compl. ¶¶ 28, 31, 34, 37, ECF No. 1.  Second, Iran is a foreign state.  Third, the Complaint contains claims arising out of the murder of Yael Botvin—claims that involve "personal injury or death."  *See* Compl. ¶ 1.  Fourth, as recognized in *Botvin*, the evidence establishes that Iran provided substantial support for Hamas' terrorist activities for the purpose of undertaking attacks such as the September 4, 1997, bombing in which Yael Botvin was killed, funneled money and material support to Hamas, and played necessary planning, logistical, and support roles leading up the bombing.  *See Botvin*, 873 F. Supp. 2d at 237–38.  This evidence

satisfies the FSIA's requirement of a causal connection between the act of the defendant and the damages that the plaintiffs have suffered.  *See Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 66 (D.D.C. 2010) (noting that FSIA requires only a "reasonable" connection, not "but-for" causation).  Finally, the 1997 bombing constitutes an extrajudicial killing that occurred as a direct and proximate result of Iran's provision of assistance to Hamas and its operatives.  The Court has original jurisdiction over plaintiffs' claims.

### 2.  Waiver of Sovereign Immunity

While this Court's exercise of jurisdiction over this action is a necessary prerequisite to moving forward, foreign states remain immune from suit absent a waiver of sovereign immunity. *Oveissi*, 879 F. Supp. 2d at 51–52.  The state-sponsored terrorism exception provides that such waiver occurs where (1) "the foreign state was designated as a state sponsor of terrorism at the time of the act . . . and . . . remains so designated when the claim is filed under this section . . . ," (2) "the claimant or the victim was, at the time of the act . . . a national of the United States . . . ," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(i)–(iii).

Here, the facts warrant waiver of Iran's sovereign immunity.  First, Iran has been designated as a state sponsor of terrorism continuously since January 1984 through the present. *See* U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02, Jan. 23, 1984; U.S. Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/list/c14151.htm; *see also Botvin*, 873 F. Supp. 2d at 237. Second, decedent, Yael Botvin, was a United States citizen up to the time of her death.  *Id.* at 238.  Finally, the murder occurred in Israel, not Iran, so the FSIA's requirement that defendant

be given an opportunity to arbitrate this claim is inapplicable.  Iran's immunity is waived, and it may be held liable.

### B.    Liability

Section 1605A(c) creates a federal private right of action for victims of state-sponsored terrorism.  A plaintiff can seek to hold a foreign state liable for (1) *inter alia*, an act of "extrajudicial killing . . . or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or agent of the foreign state, and the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."   28 U.S.C. § 1605A(a)(1), (c).   As the Court has discussed at length elsewhere, the third and fourth elements—causation and injury—"require plaintiffs to prove a theory of liability" in which plaintiffs justify the damages they seek, generally expressed "through the lens of civil tort liability."  *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163, 176 (D.D.C. 2010).

### 1. Act

Through evidence presented in the first *Botvin* case, 873 F. Supp. 2d 232, and another case arising from the same bus bombing, *Campuzano*, 281 F. Supp. 2d 258, plaintiffs have sufficiently established that Iran is culpable for both the extrajudicial killing of Yael Botvin and the provision of material support to the Hamas members involved in the bombing, which satisfies the first requirement of liability under § 1605A.

FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim Protection Act of 1991.  *See* 28 U.S.C. § 1605A(h)(7).  That Act defines an extrajudicial killing as

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note.  The evidence summarized above establishes that Yael Botvin's death was caused by a willful and deliberate act resulting from the detonation of powerful explosive bombs by Hamas members in a highly trafficked civilian area designed to inflict the maximum amount of civilian death and pain.  *Botvin*, 873 F. Supp. 2d at 238–39.  There is no evidence that this attack was sanctioned by any judicial body. The murder of Yael Botvin constitutes an extrajudicial killing undertaken by Hamas acting as an agent for Iran.

The FSIA declares that "material support or resources" is defined by reference to the Federal Criminal Code.  28 U.S.C. § 1605A(h)(3).  That definition states that support

> means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  The evidence summarized above demonstrates that during the period leading up to the bus bombing, Iran supported Hamas for the purpose of advancing its own agenda.  *See Botvin*, 873 F. Supp. 2d at 237–38.  At the time of the attack, Hamas was a terrorist organization supported tangibly and financially by Iran.  *Id.*  These acts constitute the provision of material support for FSIA purposes.

### 2.  Actor

The evidence presented establishes that Hamas acted as an agent for Iran during the 1997 bombing.  *Id.*  Under such circumstances, Iran may be held vicariously liable for the extrajudicial killing perpetrated by the Hamas suicide bombers.

### 3.  Theory of Recovery—Causation

The elements of causation and injury in § 1605A require FSIA plaintiffs "to prove a theory of liability" which justifies holding the defendants culpable for the injuries that the plaintiffs have allegedly suffered.  *Oveissi*, 879 F. Supp. 2d at 53–54 (citing *Valore*, 700 F. Supp. 2d at 73); *see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). District courts in this jurisdiction "rely on well-established principles of law, such as those found in Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to outline the boundaries of these theories of recovery.  *Bodoff v. Islamic Republic of Iran ("Bodoff II")*, 08-cv-547, 2012 WL 5995690, at *8 (D.D.C. Dec. 3, 2012); *Oveissi*, 879 F. Supp. 2d at 54 (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)).

This Court and others have frequently addressed the Intentional Infliction of Emotional Distress ("IIED") theory following the enactment of § 1605A.  *See, e.g.*, *Fain v. Islamic Republic of Iran,* 856 F. Supp. 2d 109, 123 (D.D.C. 2012).  Relying principally on the Restatement, courts have set forth the following standard: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)).  Here, this test is satisfied.

"First, a terrorist attack constitutes extreme and outrageous conduct."  *See Bodoff v. Islamic Republic of Iran ("Bodoff I")*, 424 F. Supp. 2d 74, 85 (D.D.C. 2006) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).

Second, as the Court recognized in *Botvin*, in the evidence summarized above, Yael's mother and sisters have established in great detail the severe emotional distress that resulted from the attack.  In her 2008 deposition, Julie Goldberg-Botvin, Yael's mother, reflected that "[w]e might look okay on the outside, but on the inside we are not okay, even ten years later. For me it's terrible to see Yael's friends who are now 24, 25 years old, and married and some of them have babies. It is very difficult."  *Botvin*, 873 F. Supp. 2d at 239.  Tamar testified that the news of her sister's death was the "worst of [her] life," coming "less than four years after [her] father died of coronary artery disease."  *Id.*  She stated that "[w]e were just beginning to feel like we were coming to terms with the sudden loss of a parent when our family was torn apart again."  *Id.*  Michal Botvin was just eleven-years old when the bombing occurred and accompanied her mother to the hospital where she learned of Yael's death.  She explained that "it was very hard for my mother and me and Tamar to deal with Yael's death, especially because my father died a few years before . . .  it is still hard . . . to continue living with the loss of Yael."  *Id.*

Third, supporting and funding a terrorist attack designed to kill and injure innocent civilians, as defendants did here, is at least reckless as to the prospects of causing severe emotional distress in the family members of the victims of the attack.  *See Bodoff II,* 2012 WL 5995690, at *9.

The scope of recovery under the IIED theory is limited by two qualifications: the plaintiff must be "a member of [the injured person's] immediate family" and must be "present at the time."  *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 123–24 (D.D.C. 2012) (quoting Restatement (Second) of Torts § 46(2)(a)–(b)).  Plaintiffs are either the parents or siblings of the decedent and thus fall within even the strictest definition of immediate family.  *See Valore*, 700 F. Supp. 2d at 79 (noting that immediate family "is consistent with the traditional understanding

of one's immediate family" and includes "one's spouse, parents, siblings, and children").  None of the plaintiffs in this action were present and witnesses to the bus attack.  However, this Court has previously recognized that the presence requirement is subject to a caveat—specifically, the Restatement "'expresses no opinion as to whether there may not be other circumstances under which the actor may be subject to liability.'"  *Heiser*, 659 F. Supp. 2d at 26–27 (quoting Restatement (Second) of Torts § 46).  As the *Heiser* Court explained: "Terrorism [is] unique among the types of tortuous activities in both its extreme methods and aims. . . . All acts of terrorism are by the very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror."  *Id.* at 27.  Thus, the Court concluded that a plaintiff "need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family."  *Id.*  Here, the non-present family member plaintiffs—Julie, Michal, and Tamar—satisfy the causation requirement for an award against Iran under the federal cause of action in FSIA §1605A(c).

### 4.  Personal Injury

This Court has already determined that plaintiffs have brought an action for "personal injury or death" by bringing a claim arising out of the extrajudicial killing of Yael Botvin.

### 5.  Jurisdiction

The Court has already determined that it is proper to exercise jurisdiction over defendant in this action, and that plaintiffs are only seeking monetary compensation.  This final element of liability is satisfied.   Because all elements are satisfied, Iran is liable.

## III.    DAMAGES

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages."   28 U.S.C. § 1605A(c)(4).   To obtain

damages against defendants in an FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were "reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages." *Oveissi*, 879 F. Supp. 2d at 55.  As found in the initial *Botvin* litigation, plaintiffs have proved that Iran's commission of acts of extrajudicial killing and its provision of material support and resources for such killing were reasonably certain to, and indeed intended to, cause injury to plaintiff.  Thus, as a general matter, damages are appropriate.

### A.      Compensatory Solatium Damages

As a result of the severe emotional distress suffered by Yael's mother and sisters as a result of this attack, each is entitled to solatium damages.  The general rule of this Court is that parents of deceased victims should receive $5 million, and siblings receive $2.5 million.  *See Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006).  The Court finds that these standard amounts are appropriate here and will award $5 million to Yael's mother, Julie, and $ 2.5 million to each of her sisters, Michal and Tamar—a total of $10 million in solatium.  This amount is in addition to the $1.7 million in compensatory damages awarded to the estate of Yael Botvin previously.

### B.      Punitive Damages

"Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they are awarded."  *Oveissi*, 879 F. Supp. 2d at 55–56 (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61; *Heiser*, 659 F. Supp. 2d at 29–30; *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008); Restatement (Second) of Torts § 908(1)).  As Magistrate Judge Facciola explained in a

recent opinion revising an award of punitive damages under § 1605A, "an award of punitive damages is [not] designed to be particularized per victim.  Rather, the court must arrive at a number that will serve the interest of deterrence."  *Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, 06-cv-727, 2013 WL 653921 (D.D.C. Feb. 12, 2013).

In *Murphy v. Islamic Republic of Iran*, this Court held that "[w]here there is more than one case arising out of the same facts, an analysis of the amount of punitive damages awarded compared with the amount of compensatory damages awarded can be used to gauge the amount of punishment and deterrence the Court considered necessary based on the injuries plaintiffs to that case suffered."  740 F. Supp. 2d 51, 82 (D.D.C. 2010).  Here, there is at least one other case arising out of the same attack.  In *Campuzano*, Judge Urbina awarded $300 million in punitive damages to eight plaintiffs injured (but not killed) by the same bombing, a total of $98.96 million in compensatory damages to those same plaintiffs, and $13.5 million in compensatory solatium damages to their family members—a total of $113.46 million in compensatory damages.  281 F. Supp. 2d at 279.  Under the *Murphy* approach the Court will determine the ratio of punitive to compensatory damages in the earlier case, and apply the same ratio to determine the amount of punitive damages to award in the present one.  *See Murphy*, 740 F. Supp. 2d at 81–82.[2]  From *Campuzano*, the Court takes the $300 million as the numerator and $113.46 million as the denominator and finds that this ratio is 2.64.  In other words, in *Campuzano*, Judge Urbina felt that for every $1.00 awarded in compensatory damages to the victims of the attack, the defendants should be forced to pay punitive damages of $2.64.

The Court will apply the same ratio here.  The Court previously awarded $1.7 million in compensatory damages to the estate of Yael Botvin and now awards $10 million in

---

[2] For other examples of the *Murphy* method, see, for example, *Taylor v. Islamic Republic of Iran,* 881 F. Supp. 2d 19, 24 (D.D.C. 2012) and *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 18 (D.D.C. 2010).

compensatory damages to her family members.  The total compensatory damages awarded are $11.7 million.  Multiplying this number by the ratio of 2.64, plaintiffs are entitled to a punitive damages award of $30.89 million—to be divided evenly among all four plaintiffs.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion for default judgment shall be granted.  An order shall issue with this opinion.

Signed by Royce C. Lamberth, Chief Judge, on April 4, 2013.